SO ORDERED.

SIGNED this 19th day of May, 2020.



_____
LENA MANSORI JAMES
UNITED STATES BANKRUPTCY JUDGE

---

**UNITED STATES BANKRUPTCY COURT**
**MIDDLE DISTRICT OF NORTH CAROLINA**
**WINSTON-SALEM DIVISION**

In re: )
)
Wiley Walter Shore and ) Case No. 17-50459
Shelby Jean Matthews Shore, )
)
Debtors. ) Chapter 12
_____)

**MEMORANDUM OPINION and ORDER**
**(1) GRANTING MOTION TO RECONSIDER, (2) OVERRULING OBJECTIONS TO CLAIMS,**
**(3) OVERRULING OBJECTIONS AND APPROVING APPLICATION FOR COMPENSATION, AND**
**(4) FIXING AMOUNT OF CAROLINA FARM CREDIT'S ALLOWED CLAIMS**

THIS MATTER came before the Court upon the Motion to Reconsider (Docket No. 225, the "Motion") and Application for Compensation (Docket No. 193, the "Fee Application") filed by creditor Carolina Farm Credit, ACA ("CFC"). CFC requests the Court reconsider and amend its February 6, 2018 order sustaining the objections of Wiley Walter Shore and Shelby Jean Matthews Shore (the "Debtors") to Claims 6 and 7 of CFC and requiring CFC to file an application for attorneys' fees within 14 days (Docket No. 125, the "Claim Objection Order"). CFC requests, in light of the recent decision of the Fourth Circuit Court of Appeals in *SummitBridge National Investments III, LLC v. Faison*, 915 F.3d 288 (4th Cir. 2019), that the Court reconsider the rationale it applied in the Claim Objection Order, determine that 11 U.S.C.

§ 506(b)[1] has no application to prepetition claims for attorneys' fees, and enter an order overruling the Debtors' objections and approving CFC's asserted attorneys' fees in the total amount of $181,682.51, representing fifteen percent (15%) of its outstanding debt as of the Debtors' bankruptcy petition date. CFC cites N.C. Gen. Stat. § 6–21.2(2) for the amount it claims due as attorneys' fees, which is approximately $68,000 more than the incurred fees and expenses documented in its submitted application for attorneys' fees, which totaled $113,440.12 for the period from September 12, 2016 to June 19, 2019. (Docket No. 193). The Debtors[2] filed responses objecting to both the Motion and the Fee Application (Docket No. 233, 234, 243, 244). The Bankruptcy Administrator also filed responses opposing both the Motion and the Fee Application (Docket No. 241, 242). CFC filed numerous replies to the objections of both the Debtors and the Bankruptcy Administrator (Docket No. 237, 238, 245, 246).

For the reasons discussed below, the Court will grant CFC's motion to reconsider and will approve the Fee Application. The Court has examined the Fourth Circuit's decision in *SummitBridge*, with its clarifications regarding the interplay between § 502 and § 506(b), and considered the changed nature of this bankruptcy case, which has progressed for two years since the Claim Objection Order and resulted in additional accumulated fees for CFC. The Court is also cognizant of the fact that CFC has now submitted timesheets that aid the Court in determining the reasonableness of its fees. In addition, as reflected by the record in this case, including the various hearings in the last nine months, counsel for CFC dedicated a substantial amount of time to this case subsequent to June 19, 2019 and will continue to spend time on this

---

[1] All citations to statutory sections refer to Title 11, United States Code, unless otherwise indicated.

[2] Wiley Walter Shore died on May 4, 2019 and on July 3, 2019, the Court entered an Order permitting Shelby Jean Matthews Shore to continue in the administration of this bankruptcy case (Docket No. 194). In the interests of clarity, the Court will continue to refer to the "Debtors" in the plural form throughout this opinion, despite the changed nature of the case.

case in the future. While the Court does not agree with CFC's reading of N.C. Gen. Stat. § 6–21.2(2), CFC has submitted sufficient documentation, when combined with the additional pleadings and the subsequent activity within the bankruptcy case, for the Court to find the $181,682.51 that CFC requests in attorneys' fees to be reasonable under both North Carolina law and § 506(b).

## BACKGROUND FACTS

The Court assumes the reader's familiarity with the factual underpinnings of this case, which are not contested. The Debtors filed a petition for relief under Chapter 12 of the Bankruptcy Code on April 27, 2017. On August 4, 2017, CFC filed two secured claims in the case, for a combined total amount of $1,393,576.96,[3] which were secured by deeds of trust recorded with the Register of Deeds in Yadkin County. Of the combined total claim amount, $181,682.51 constitutes attorneys' fees,[4] which CFC calculated as 15% of the principal and interest balance as of the petition date.

CFC's promissory notes contain the same attorneys' fee provision:

If Association [CFC] employs attorney(s) to collect the indebtedness evidenced by this note, or to enforce or preserve any right provided for herein or relating to any security for this note, or suit is filed hereon, or proceedings are had in bankruptcy or any other court whatsoever with respect thereto, then, in addition to any principal, interest or other charges as provided for herein, Association shall also recover all costs and expenses, *including attorneys' fees and legal expenses reasonably incurred in connection therewith,* including such costs and fees incurred on appeal. Such amounts shall become part of the indebtedness evidenced hereby and shall be immediately payable on demand, and shall, to the extent permitted by law, bear interest from the date incurred until paid at the rate provided herein. (Emphasis added.)

Also, CFC's deeds of trust contain the following language:

---

[3] Claim 6 asserts a secured claim in the total amount of $1,258,726.58 under the terms of an original promissory note dated January 30, 2006, as subsequently modified. Claim 7 states a secured claim in the total amount of $134,850.38 under the terms of a promissory note dated November 10, 2014.
[4] Claim 6 contained attorneys' fees of $164,116.51, while Claim 7 cited attorneys' fees totaling $17,566.00.

> In the event of default, if the Lender [CFC] employs counsel to collect the debt evidenced by any note secured hereby, or to enforce or protect any rights provided for herein, in any court or before any administrative body whatsoever, then in addition to any principal, interest, and other charges as provided for in any note secured hereby, *Lender shall also recover all costs and expenses reasonably incurred by Lender, including reasonable attorneys' fees, which costs, expenses and attorneys' fees shall become part of the indebtedness secured hereunder*, shall be immediately payable, and shall draw interest from the date Lender retains counsel until paid at the highest rate provided in any note or notes secured hereby. (Emphasis added.)

In compliance with its noticing obligations under N.C. Gen. Stat. § 6–21.2(5), CFC sent demand letters to the Debtors on November 10, 2016 and November 21, 2016 regarding the indebtedness evidenced by Claim 6 and Claim 7, respectively.[5]

By order dated November 8, 2017, the Court confirmed the Debtors' amended chapter 12 plan as filed on September 1, 2017 and modified in court on October 19, 2017 (the "Plan"). The Plan modified terms of the existing CFC indebtedness as stated in Claims 6 and 7 including both the date of maturity of the debt and payment terms. As to CFC's attorneys' fees, the Plan provides

> The Debtors have objected to Claims 6 and 7 that claim 15% attorneys' fees in the total amount of $181,682.51 on the basis that only reasonable and actual attorneys' fees should be allowed. If the Debtors are successful in their existing claim objections, then Farm Credit has the right to file an application for attorneys' fees pursuant to Section 506(b) of the Bankruptcy Code, to which the Debtors have the right to object.

(Docket No. 108, p. 3).

After briefing from the Debtors, CFC, and the Bankruptcy Administrator, the Court entered the Claim Objection Order on February 6, 2018 (Docket No. 125). The Court extensively retraced the caselaw considering whether the 15% attorneys' fees described within N.C. Gen. Stat. § 6–21.2(2) should be viewed as a mandate or simply a cap. The Court, however, found it

---

[5] CFC's demand letters contained the same language: "Pursuant to North Carolina General Statutes Section 6-21.2, you are hereby notified that the provisions in the Note relative to the payment of attorney's fees and collections costs will be enforced unless you pay the amount due within five (5) days from the date of this letter."

unnecessary to resolve the question, deciding instead to follow the existing practice in the district to determine an award of prepetition and postpetition attorneys' fees together, through the application of § 506(b). To that end, the Court sustained the Debtors' objections and ordered CFC to file an application for attorneys' fees within 14 days of the Claim Objection Order.

Prior to filing an application for attorneys' fees, CFC appealed the Claim Objection Order on February 19, 2018 (Docket No. 131). While there was no resolution of CFC's appeal for more than a year, all parties continued to cooperate in pushing forward the Debtors' bankruptcy case, including the approval of sales of real property under § 363(f)(2), which the Debtors finalized with the consent of CFC (Docket No. 203, 210). On June 26, 2019, the District Court dismissed CFC's appeal, finding the Claim Objection Order was interlocutory and not a final order under 28 U.S.C. § 158(a)(1), which was required to grant the District Court jurisdiction over the appeal. *Carolina Farm Credit ACA v. Shore*, No. 1:18CV118, 2019 WL 2617098 (M.D.N.C. June 26, 2019).

Following the dismissal of the appeal, on July 2, 2019, CFC filed its application for attorneys' fees as required by the Claim Objection Order (Docket No. 193, the "Fee Application"). After efforts to reach a global settlement faltered, CFC filed the instant Motion on February 14, 2020. Rather than hearing oral arguments telephonically,[6] the Court provided the parties with a final opportunity to file any last replies on the Motion and the Fee Application before taking both matters under advisement. The Debtors, CFC, and the Bankruptcy Administrator all subsequently filed replies (Docket Nos. 241–246).

---

[6] Due to the ongoing COVID-19 outbreak, the Bankruptcy Court for the Middle District of North Carolina issued a standing order that all bankruptcy hearings are to be conducted telephonically until further order. *See* Amended Standing Order re Court Operations Under the Exigent Circumstances Created by COVID-19 (effective Mar. 26, 2020).

The Debtors oppose both the Motion and the Fee Application, arguing there is no basis for reconsidering the Claim Objection Order under Rule 54(b) of the Federal Rules of Civil Procedure and, if the Court is inclined to grant reconsideration, N.C. Gen. Stat. § 6–21.2(2) does not entitle CFC to a strict, no-look 15% attorneys' fee award. The Debtors also contend that CFC's Fee Application was filed long after the 14-day deadline instituted by the Claim Objection Order and is thus untimely and should be denied in its entirety. The Bankruptcy Administrator filed responses critical of both the Motion and the Fee Application, arguing that CFC was rehashing old arguments that *SummitBridge* does not address, which does not warrant reconsideration of the Claim Objection Order, that N.C. Gen. Stat. § 6–21.2(2) is not a mandate, but a cap on a fee award, and, if any portion of CFC's attorneys' fees are deemed unreasonable under § 506(b), and thus unsecured, the confirmed chapter 12 plan does not provide for the payment of those unsecured fees. The Bankruptcy Administrator also objected to approximately $35,250 in fees related to the interlocutory appeal, arguing such fees should be disallowed because the appeal was premature and did not protect or enforce the creditor's rights.

DISCUSSION

The Court first assesses the basis for reconsideration under Fed. R. Civ. P. 54(b) as well as the assertions by the Debtor that CFC's Fee Application is untimely and must be denied in its entirety. The Court will then consider the enforceability and amount of CFC's claims for attorneys' fees under § 502(b), before determining the extent to which any of the allowed fees constitute part of CFC's secured claims under § 506(b).

1.   <u>Basis for Reconsideration and Timeliness of Fee Application</u>

CFC moves for reconsideration of the Claim Objection Order, citing the impact of the Fourth Circuit's decision in *SummitBridge National Investments III, LLC v. Faison*, 915 F.3d

6

288 (4th Cir. 2019). CFC argues that *SummitBridge* "is controlling authority applicable to the issues in this case," thus warranting reconsideration and amending of the Claim Objection Order to emphasize that § 506(b) "has no application to prepetition claims for attorneys' fees[.]" (Docket No. 225, pp. 16, 18).

Because the Claim Objection Order is not a final judgment, CFC's motion for reconsideration is adjudged according to Rule 54(b) of the Federal Rules of Civil Procedure, rather than Rules 60 or 59, which apply only to final judgments. Rule 54(b) provides that "any order or other decision" that "adjudicates fewer than all the claims or the rights and liabilities of fewer than all the parties does not end the action as to any of the claims or parties and may be revised at any time" before entry of a final judgment. The Court may revisit the Claim Objection Order, or any interlocutory order, "at any time prior to final judgement under Fed. R. Civ. P. 54(b) or its inherent authority," but its authority to do so "is discretionary, not automatic." *United States v. Duke Energy Corp.*, 218 F.R.D. 468, 473–74 (M.D.N.C. 2003) (citing *Fayetteville Investors v. Commercial Builders, Inc.*, 936 F.2d 1462, 1472–73 (4th Cir. 1991)).

The Fourth Circuit has not provided clear guidance on the proper standard for evaluating a motion for reconsideration under Rule 54(b). While Rules 59 and 60 do not govern reconsideration of an interlocutory order, the Fourth Circuit has suggested at least parts of those rules may guide a court's analysis. *Saint Annes Dev. Co. LLC. v. Trabich*, No. WDQ-07-1056, 2012 WL 135281, at *3 (D. Md. Jan. 13, 2012) (citing *Am. Canoe Ass'n, Inc. v. Murphy Farms, Inc.*, 326 F.3d 505, 515 (4th Cir. 2003)). A number of courts within the Fourth Circuit have applied a "three-circumstance" test, under which a prior interlocutory order will not be revisited "unless: (1) a subsequent trial produces substantially different evidence, (2) controlling authority has since made a contrary decision of law applicable to the issue, or (3) the prior decision was

clearly erroneous and would work manifest injustice." *United States v. Duke Energy Corp.*, No. 1:00CV1262, 2014 WL 4659479, at \*3 (M.D.N.C. Sept. 17, 2014) (citing *TFWS, Inc. v. Franchot*, 572 F.3d 186, 191 (4th Cir. 2009)). However, any guidance provided by Rules 59 and 60 must be tempered by the Fourth Circuit's reminder that "a review of an interlocutory order under Rule 54 is not subject to the restrictive standards of motions for reconsideration of final judgments[.]" *Fayetteville Investors v. Commercial Builders, Inc.*, 936 F.2d 1462, 1472 (4th Cir. 1991); *see also Saint Annes Dev. Co., Inc. v. Trabich*, 443 F. App'x 829, 832 (4th Cir. 2011).

Looking to the three-circumstance test, the Court finds there to be controlling authority issued since the Claim Objection Order. *See SummitBridge National Investments III, LLC v. Faison*, 915 F.3d 288 (4th Cir. 2019). *SummitBridge* crystallizes that a § 506(b) reasonableness test does not weigh into a determination on the general allowability of contractual attorneys' fees under § 502(b). *Id*. at 294. *SummitBridge* also definitively states that contractual attorneys' fees provisions, such as those in this case, are contingent prepetition obligations that become fixed postpetition when the fees are incurred. *Id*. at 292 (citing *SNTL Corp. v. Ctr. Ins. Co. (In re SNTL Corp.)*, 571 F.3d 826, 844 (9th Cir. 2009)). Additionally, *SummitBridge* clarifies the sequential steps the Court will adopt in this dispute: (1) determining the allowability and the amount of CFC's claim, including attorneys' fees, under § 502(b), and then (2) determining the status of all or portions of that claim as secured or unsecured under § 506(b). While it does not undercut the Claim Objection Order in its entirety, the *SummitBridge* decision does meet the lower standard for a "contrary decision of law" within the context of reconsidering an interlocutory order under Rule 54(b), through its finding that § 506(b) does not factor into the initial determination of a claim's allowability and amount under § 502(b).

The changed circumstances of this bankruptcy case further support revisiting and amending the Claim Objection Order. Over two years have passed since this matter was first before the Court in December 2017 and, in that intervening period, the Debtors' case has continued to progress, including the approval of sales of real property under § 363(f)(2). This has resulted in additional accumulated fees for CFC, which helped facilitate the orders approving those prospective sales. Counsel to the Debtors and CFC also engaged in substantive negotiations toward a global settlement or discounted payoff of CFC's debt, as described by counsel at the October 16, 2019 hearing. The proposed resolution stemming from those negotiations was formalized in a Motion to Modify Plan filed by the Debtors, which sought to modify the treatment of CFC in the confirmed plan; this negotiation was substantial as indicated by the proposed terms of the repayment of CFC's indebtedness, which differed significantly from the confirmed plan.[7] Furthermore, in contrast to when the Court first considered the question, it now has CFC's timesheets before it to enable a clearer determination of the allowability of CFC's claims under § 502(b).

The changed circumstances of a case have been relied upon by courts in granting motions to reconsider under Rule 54(b). *See, e.g.*, *Walker v. Gusman*, No. 12-2521, 2015 U.S. Dist. LEXIS 6896, at *7 (E.D. La. Jan. 21, 2015) (finding "narrow reconsideration" of prior rulings to be appropriate "[i]n light of the changed circumstances, particularly the appointment of counsel"); *MedApproach Holdings, Inc. v. Hawkins*, No. 3:11-cv-01199, 2014 WL 317710, at *4 (M.D. Tenn. Jan. 28, 2014) (declining to reconsider under Rule 54(b) where party did not identify "any changed circumstances, *such as an evidentiary development* or a change in

---

[7] The Motion to Modify Plan, which was filed on November 26, 2019 was withdrawn on January 7, 2020, presumably because the Debtors could not provide the funds to consummate the renegotiated terms of the settlement.

controlling law" to justify such action) (emphasis added); *Disc. Tobacco Warehouse, Inc. v. Briggs Tobacco & Specialty Co. Inc.*, No. 3:09-CV-05078, 2010 WL 3522476, at *2 (W.D. Mo. Sept. 2, 2010) (remarking on the need for a court to reconsider interlocutory orders under Rule 54(b) "to modify orders in response to the changing circumstances of a lawsuit before it").

Collectively, the intervening issuance of the *SummitBridge* decision, with its clarification on the role of the § 506(b) reasonableness analysis in the initial determination of claim allowance under § 502(b), as well as the changed circumstances in this bankruptcy case, support this Court's finding that narrow reconsideration of the Claim Objection Order is appropriate. This is especially true within the context of a motion to reconsider an interlocutory order under Rule 54(b), which "is not cabined by the 'heightened standards for reconsideration' governing final orders." *Saint Annes Dev. Co., Inc. v. Trabich*, 443 F. App'x 829, 832 (4th Cir. 2011). For this reason, the Court will grant CFC's motion to reconsider, reassess the Debtors' objection to CFC's claims, and determine the amount and status of CFC's claims, including its attorneys' fees.

Granting the motion to reconsider also resolves the Debtors' objection to the timeliness of the Fee Application. The Debtors contend the Fee Application was filed "nineteen months after the deadline set by the Court" and at no time did CFC move for an extension of time nor did it seek an order for stay pending appeal (Docket No. 234, ¶ 22). As such, the Debtors argue the Fee Application should be denied as untimely. However, the granting of the Motion affects all aspects of the Claim Objection Order, including all contained deadlines. In similar instances in which courts granted motions to reconsider, those courts also extended or reset any attendant deadlines. *See, e.g.*, *Coste v. Jackson*, No. 13-119, 2013 WL 6004049 (E.D. La. Nov. 13, 2013) (granting plaintiff's motion for reconsideration and issuing a new scheduling order resetting the

10

pretrial and trial dates); *Cantu v. Garcia*, No. 1:09-cv-00177, 2013 WL 594301 (E.D. Cal. Feb. 15, 2013) (extending the discovery and dispositive motion deadlines after granting motion to reconsider); *Odom v. Troy Constr., L.L.C.*, No. 1:09-CV-367, 2010 WL 519744 (E.D. Tex. Feb. 9, 2010) (granting motion for reconsideration, setting aside dismissal and resetting case management deadlines).[8] Accordingly, in light of granting CFC's Motion, the Court overrules the Debtors' objection to the Fee Application as untimely and will consider the Fee Application in its determination of the amount and status of CFC's claims.

### 2. Claim Allowance under 11 U.S.C. § 502(b)

A court's responsibility to determine the amount and status of a claim is triggered by an objection to claim. *See* § 502(b). Under 11 U.S.C. § 502(a), a properly filed proof of claim is deemed allowed unless a party in interest objects. After such an objection is made, the court "*shall determine the amount of such claim* in lawful currency of the United States as of the date of the filing of the petition, and shall allow such claim in such amount," unless the claim is disallowed by falling into one of the nine exceptions listed in § 502(b)(1)–(9). *See* § 502(b) (emphasis added). "[C]laims enforceable under state law are presumed allowable, and [] this presumption may be overcome only by an *express* disallowance." *SummitBridge National Investments III, LLC v. Faison*, 915 F.3d 288, 294 (4th Cir. 2019); *see also* 4 COLLIER ON BANKRUPTCY ¶ 506.04(3)(a) (16th ed. 2020) ("Generally, if a claim is valid under applicable state law, then it is properly included as part of the creditor's claim under section 502, absent a

---

[8] Resetting the Fee Application deadline is further warranted by CFC's behavior during this case following the Claim Objection Order. Despite the long duration of appellate review, CFC did not hinder or delay the progress of the bankruptcy case; instead, CFC participated in the § 363 sales process that resulted in orders approving the sales and continued to negotiate in good faith with the Debtors to reach a global settlement and resolve the attorneys' fee dispute. This factor further supports resetting the Fee Application deadline in this instance. *See, e.g., Moralez v. Young*, No. 1:16-cv-00282, 2017 WL 11477733, at *3 (E.D. Cal. Apr. 12, 2017) (extending discovery deadline after resolution of plaintiff's motion for reconsideration where plaintiff was "diligent in pursuing written discovery, and has not required the parties to expend resources on potentially unnecessary depositions.")

contrary provision in the Code."). "North Carolina law allows for the recovery of reasonable attorney's fees incurred in connection with collection of a debt, when the note provides for such recovery." *In re Ormond*, No. 12-05489-8-SWH, 2015 WL 1000218, at *5 (Bankr. E.D.N.C. Mar. 3, 2015). Because CFC's claims for attorneys' fees are allowable under state law, and do not fall into one of the nine enumerated exceptions providing for disallowance under § 502(b)(1)–(9), the Debtors' objection requires this Court to "determine the amount of such claim[s]." § 502(b); *see also SummitBridge*, 915 F.3d at 292.

In determining the amount of CFC's claims under § 502(b), the Court "is guided by otherwise applicable state or federal law, whether the claim is liquidated or contingent or if any other issues exist which bear upon the amount of the claim." 4 COLLIER ON BANKRUPTCY ¶ 502.03(1)(a) (16th ed. 2020). Both the notes and the deeds of trust in this matter are governed by North Carolina law and contain provisions providing for reasonable attorneys' fees in the event CFC must undertake collection efforts. Therefore, North Carolina law will guide the Court's determination of the amount of CFC's claims for purposes of § 502(b).

a. *The Permissible Range of Fees under N.C. Gen. Stat. § 6-21.2(2)*

While in North Carolina attorneys' fees are generally not recoverable "absent express statutory authority for fixing and awarding them," *Bombardier Capital, Inc. v. Lake Hickory Watercraft, Inc.*, 632 S.E.2d 192, 196 (N.C. Ct. App. 2006), contractual agreements to pay attorneys' fees are valid and enforceable under N.C. Gen. Stat. § 6-21.2. *In re Yow*, No. 11-06011-5-SWH, 2019 WL 267780, at *4 (Bankr. E.D.N.C. Jan. 18, 2019). The operative provision relating to attorneys' fees in notes and deeds of trust is N.C. Gen. Stat. § 6-21.2, which reads:

> Obligations to pay attorneys' fees upon any note, conditional sale contract or other evidence of indebtedness, in addition to the legal rate of interest or finance charges specified therein, shall be valid and enforceable, and collectible as part of such debt,

12

if such note, contract or other evidence of indebtedness be collected by or through an attorney at law after maturity, subject to the following provisions:

> (1) If such note, conditional sale contract or other evidence of indebtedness provides for attorneys' fees in some specific percentage of the "outstanding balance" as herein defined, such provision and obligation shall be valid and enforceable up to but not in excess of fifteen percent (15%) of said "outstanding "balance" owing on said note, contract or other evidence of indebtedness.

> (2) If such note, conditional sale contract or other evidence of indebtedness provides for the payment of reasonable attorneys' fees by the debtor, without specifying any specific percentage, such provision shall be construed to mean fifteen percent (15%) of the "outstanding balance" owing on said note, contract or other evidence of indebtedness.

…

"Outstanding balance" is defined in § 6-21.2(3) as the principal and interest owing at the time the suit is instituted to enforce any security agreement securing payment of the debt and/or to collect said debt. N.C. Gen. Stat. § 6-21.2(3). Because the notes and deeds of trust securing the indebtedness to CFC do not provide for a specific percentage of the outstanding balance as attorneys' fees, the determination of the amount is governed by N.C. Gen. Stat. § 6-21.2(2).

As set forth in the Claim Objection Order, the caselaw surrounding N.C. Gen. Stat. § 6–21.2(2) is far from settled. The question at issue is whether subdivision (2) "mandates an award of 15% of the 'outstanding balance' as attorneys' fees or whether it merely serves as a cap on such fees." *Monsanto Co. v. Are-108 Alexander Road, LLC*, No. 1:10CV898, 2013 WL 3280265, *1 (M.D.N.C. June 27, 2013). The Court discussed the diverging views of N.C. Gen. Stat. § 6–21.2(2) at length in the Claim Objection Order and will not repeat that analysis (Docket No. 125, pp. 6–13). It is worth restating, however, that the Supreme Court of North Carolina has not provided clear guidance on the proper interpretation of N.C. Gen. Stat. § 6–21.2(2), while decisions from the North Carolina Court of Appeals and federal courts have fallen on both sides

of the debate, with some finding N.C. Gen. Stat. § 6–21.2(2) mandates an award of 15%[9] while others view the provision as a cap rather than a mandate.[10] Consequently, the caselaw at both the state and federal levels does not yield a clear consensus on the question.

The Supreme Court of North Carolina has provided guidance on the approach courts should follow in interpreting ambiguous statutes open to more than one reasonable interpretation:

> When the language of a statue is clear and without ambiguity, it is the duty of this Court to give effect to the plain meaning of the statute, and a judicial construction of legislative intent is not required. However, when the language of a statute is ambiguous, this Court will determine the purpose of the statute and the intent of the legislature in its enactment.

*Diaz v. Div. of Soc. Servs.*, 628 S.E.2d 1, 3 (N.C. 2006) (citations omitted). Statutes "should be construed so that the resulting construction harmonizes with the underlying reason and purposes of the statute." *Midrex Techs., Inc. v. N.C. Dep't of Revenue*, 794 S.E.2d 785, 792 (N.C. 2016) (internal citations omitted). In identifying the underlying reason and purposes of the statute, North Carolina courts are instructed to "ascertain the intent of the legislature, first by applying the statute's language and, if necessary, considering its legislative history and the circumstances of its enactment." *Lanvale Props., LLC v. Cnty of Cabarrus*, 731 S.E.2d 800, 815 (N.C. 2012). Here, the Court's research has not identified any material that can be characterized as legislative history pertaining to the enactment of N.C. Gen. Stat. § 6–21.2(2). *See also* Christopher Richard

---

[9] North Carolina Court of Appeals decisions finding the 15% award within N.C. Gen. Stat. § 6–21.2(2) constitutes a mandate include *Trull v. Cent. Carolina Bank & Trust*, 478 S.E.2d 39 (N.C. Ct. App. 1996); *Devereux Properties, Inc. v. BBM&W, Inc.*, 442 S.E.2d 555, 558 (N.C. Ct. App. 1994) *review denied* 448 S.E.2d 519 (N.C. 1994); *Nucor Corp. v. General Bearing Corp.*, 405 S.E.2d 776, 778 (N.C. Ct. App. 1991), *rev'd on other grounds*, 423 S.E.2d 747 (N.C. 1992). Federal cases finding the same include *TD Bank, N.A. v. Grace Unlimited Ventures, LLC*, No. 3:14-cv-00279-FDW-DCK, 2014 WL 3547356 (W.D.N.C. July 17, 2014); *FDIC v. Dion Holdings, LLC*, No. 1:11-cv-00083-MR-DLH, 2012 WL 6212655 (W.D.N.C. Dec. 13, 2012).

[10] North Carolina Court of Appeals decisions finding the 15% award within N.C. Gen. Stat. § 6-21.2(2) constitutes a cap, rather than a mandate, include *Telerent Leasing Corp. v. Boaziz*, 686 S.E.2d 520 (N.C. Ct. App. 2009); *Bombardier Capital, Inc. v. Lake Hickory Watercraft, Inc.*, 632 S.E.2d 192 (N.C. Ct. App. 2006). Federal cases finding the same include *In re Yow*, No. 11-060111, 2019 WL 267780 (Bankr. E.D.N.C. Jan. 18, 2019); *In re Ormond*, No. 12-05489-8-SWH, 2015 WL 1000218 (Bankr. E.D.N.C. Mar. 3, 2015); *Ergs II, L.L.C. v. Lichtin*, No. 5:12-CV-431-FL, 2013 WL 12250339 (E.D.N.C. Aug. 22, 2013); *Silverdeer St. John Equity Partners I LLC v. Kopelman*, No. 5:11-CV-95-JG, 2012 WL 4422811 (E.D.N.C. Sept. 24, 2012).

Opalinski, Note, *Attorneys' Fees-Contractual Allocation of Attorneys' Fees as Costs of Litigation Pursuant to G.S. 6-21.2*-Stillwell Enterprises, Inc. v. Interstate Equipment Co., 17 WAKE FOREST L. REV. 457, 471 (1981) (remarking upon the "scant legislative history available" for N.C. Gen. Stat. § 6-21.2). Despite the lack of legislative history, the intent of the legislature can still "be gathered from the full context of the statute and other statutes related to the subject." *Heaton v. City of Charlotte*, 178 S.E.2d 352, 361 (N.C. 1971).

The United States Supreme Court has emphasized the critical importance of context in statutory interpretation, finding that "[s]tatutory construction ... is a holistic endeavor. A provision that may seem ambiguous in isolation is often clarified by the remainder of the statutory scheme …" *United Sav. Ass'n of Tex. v. Timbers of Inwood Forest Assocs., Ltd.*, 484 U.S. 365, 371 (1988); *see also Hartford Underwriters Ins. Co. v. Union Planters Bank, N.A.*, 530 U.S. 1, 6 (2000) (considering the statute's "contextual features"). The Supreme Court of North Carolina echoes this view of looking to the broader context of a statute to ascertain meaning, holding that "the ultimate issue" is "what relevant statutory language, when read in context and in its entirety, should be understood to mean." *Midrex Techs., Inc. v. N.C. Dep't of Revenue*, 794 S.E.2d 785, 795 (N.C. 2016). In interpreting a different subdivision of N.C. Gen. Stat. § 6–21.2, the Supreme Court of North Carolina found "[t]he proper scope of the term's application must therefore be gleaned from the context of the statute in which it appears and the factual circumstances surrounding the instrument or transaction to which it is sought to be applied." *Stillwell Enter., Inc. v. Interstate Equip. Co.*, 266 S.E.2d 812, 816 (N.C. 1980).

While reading subdivision (2) as a mandate requiring 15% attorneys' fees in all cases may be plausible when read in isolation, when viewed in the context of the surrounding provisions of N.C. Gen. Stat. § 6–21.2, the better interpretation is that subdivision (2) provides

for attorneys' fees, which are supported by documentation, up to a statutory cap of 15% of the outstanding balance. Subdivision (1) provides that, if a specific percentage is stated within the note, "such *provision and obligation* shall be *valid and enforceable* up to but not in excess of fifteen percent (15%) of said outstanding balance." N.C. Gen. Stat. § 6–21.2(1) (emphases added).[11] In contrast, subdivision (2) provides that, if a specific percentage is not given within the note, "such *provision* shall be *construed to mean* fifteen percent (15%) of the outstanding balance …" N.C. Gen. Stat. § 6–21.2(2) (emphases added).[12] While subdivision (1) dictates the extent to which the provision is "valid and enforceable," subdivision (2) merely controls what a provision lacking a clearly stated percentage is "construed to mean." Moreover, unlike subdivision (1), which describes the treatment of both the "provision *and obligation*," subdivision (2) describes only the manner in which to construe "the provision" and not the obligation. The best reading of the parts of N.C. Gen. Stat. § 6–21.2 is that subdivision (1) provides that, no matter the number stated within an attorneys' fee provision, both the "provision and obligation" are only "valid and enforceable" up to 15% of the outstanding balance. Subdivision (2), when read in conjunction with subdivision (1), only affects how the "provision" and its missing percentage, not the obligation itself, is to be "construed."

Reading both subdivision (1) and (2) together yields the most coherent interpretation of both parts of N.C. Gen. Stat. § 6–21.2. Courts in North Carolina must presume that "the legislature carefully chose each word used," *N.C. Dep't of Corr. v. N.C. Med. Bd.*, 675 S.E.2d

---

[11] "(1) If such note, conditional sale contract or other evidence of indebtedness provides for attorneys' fees in some specific percentage of the "outstanding balance" as herein defined, such provision and obligation shall be valid and enforceable up to but not in excess of fifteen percent (15%) of said "outstanding "balance" owing on said note, contract or other evidence of indebtedness." N.C. Gen. Stat. § 6–21.2(1).

[12] "(2) If such note, conditional sale contract or other evidence of indebtedness provides for the payment of reasonable attorneys' fees by the debtor, without specifying any specific percentage, such provision shall be construed to mean fifteen percent (15%) of the "outstanding balance" owing on said note, contract or  other evidence of indebtedness." N.C. Gen. Stat. § 6–21.2(2).

641, 649 (N.C. 2009), and that "the legislature acted with full knowledge of prior and existing law." *Ridge Cmty. Investors, Inc. v. Berry*, 239 S.E.2d 566, 570 (N.C. 1977). Subdivisions (1) and (2) of N.C. Gen. Stat. § 6–21.2 are not mirror images of each other in their use of operative language. We may presume the legislature deliberately designed subdivision (1) to affect the validity and enforceability of both the provision and obligation while the same legislature provided that subdivision (2) altered the manner in which only the provision was construed, while saying nothing on the validity and enforceability of the obligation. Put simply, subdivision (2), read in context, appears not to affect the validity or enforceability of the obligation itself, but only the way in which the reader is to construe the unstated, missing percentage in a given provision. In the case of an attorneys' fee provision with no stated percentage, courts should construe that missing percentage to read 15% of the outstanding balance, which, according to subdivision (1), is then "valid and enforceable up to but not in excess of fifteen percent (15%) of the outstanding balance[.]" This interpretation thus provides "a harmonious — not discordant — note in the general tenor of the law." *Watson Indus., Inc. v. Shaw*, 69 S.E.2d 505, 511 (N.C. 1952).

This interpretation of N.C. Gen. Stat. § 6–21.2(2) corresponds to the more recent decisions of the North Carolina Court of Appeals, which "suggest that strict application of the 15% calculation is not proper." *In re Yow*, No. 11-06011-5-SWH, 2019 WL 267780, at *5 (Bankr. E.D.N.C. Jan. 18, 2019) (citing *Bombardier Capital, Inc. v. Lake Hickory Watercraft, Inc.*, 632 S.E.2d 192, 197 (N.C. Ct. App. 2006); *Telerent Leasing Corp. v. Boaziz*, 686 S.E.2d 520, 524 (N.C. Ct. App. 2009)). These decisions emphasize that "[t]he law requires evidence and findings of fact supporting the reasonableness of [an attorneys' fee] award under N.C. Gen. Stat. § 6–21.2(2)." *Telerent*, 686 S.E.2d at 524. In making an award under N.C. Gen. Stat. § 6–

17

21.2(2), which was not intended "as a means of legislating a total end to hearings on attorneys' fees," *Coastal Production Credit Ass'n v. Goodson Farms, Inc.*, 319 S.E.2d 650, 654 (N.C. Ct. App. 1984), courts should look at evidence of reasonableness, up to a statutory cap of fifteen percent (15%). *Ergs II, LLC v. Lichtin*, No. 5:12-CV-431-FL, 2013 WL 12250339, at *5 (E.D.N.C. Aug. 22, 2013). Accordingly, the Court will assess the reasonableness of the $181,682.51 that CFC claims in attorneys' fees for purposes of N.C. Gen. Stat. § 6–21.2(2).

b. *Fixing the Amount of CFC's Contractual Attorneys' Fees*

Having determined that North Carolina law provides for CFC's contractual attorneys' fees up to a statutory cap of 15% of the outstanding balance, the Court must look to the documentation provided by CFC, as well as the context and developments within the bankruptcy case, to determine the actual amount of CFC's attorneys' fees to be included in its claims under § 502(b). As in *SummitBridge*, CFC's right to payment of attorneys' fees under the Debtors' promissory notes and deeds of trust "was contingent on a future, postpetition event — namely, the notes being placed with an attorney for collection." *SummitBridge National Investments III, LLC v. Faison*, 915 F.3d 288, 292 (4th Cir. 2019). As such, the Debtors' obligation to pay CFC's attorneys' fees in collection efforts was a prepetition obligation, although the amount of CFC's attorneys' fees was not yet fixed at that time. *Id.*; *see also Ogle v. Fidelity & Deposit Co. of Md*, 586 F.3d 143, 146 (2d Cir. 2009); *SNTL Corp. v. Ctr. Ins. Co. (In re SNTL Corp.)*, 571 F.3d 826, 844 (9th Cir. 2009)). Therefore, the actual amount of CFC's attorneys' fees continues to accrue since the petition was filed.

While the contractual attorneys' fees at issue in this case parallel those in *SummitBridge* in some respects, there are two procedural distinctions that direct this Court's analysis along a different path. First, *SummitBridge* only considered the narrow legal question of whether the contractual attorneys' fees at issue constituted an allowable claim under § 502. The Fourth

18

Circuit did not have to address the actual amount of the fees as determined by state law because the bankruptcy court itself had not addressed that question. Second, the attorneys' fees at issue in *SummitBridge* constituted an unsecured claim, a point the parties did not dispute. Consequently, the *SummitBridge* court did not need to assess whether the attorneys' fees were to be included as a secured claim under § 506(b).[13]

Here, this Court must adopt a more expansive analytical approach, akin to that adopted in *In re Nixon*, No. 09-417, 2009 WL 1845229 (E.D. Pa. June 25, 2009). In *Nixon*, the court similarly had to first fix the actual amount of attorneys' fees under state law for purposes of allowing and determining the amount of the creditor's claim under § 502(b). The *Nixon* court then had to assess those allowed fees to determine their secured status under § 506(b):

> [T]he agreements here are by their terms subject to Pennsylvania law but contain no formula for the calculation of fees. If the agreements or Pennsylvania law would forbid the recovery of the attorneys' fees here, or any portion thereof, they must be disallowed under § 502. Those attorneys' fees deemed allowable would then be subject to a § 506(b) analysis.

*Id.* at *8. The Court will approach this question in the same manner as the *Nixon* court. The initial step is determining the amount of CFC's attorneys' fees under N.C. Gen. Stat. § 6–21.2(2), which are then allowed fees under § 502(b). The Court will later turn to determining the secured status of CFC's allowed attorneys' fees under § 506(b).

In assessing the scope of attorneys' fees under N.C. Gen. Stat. § 6–21.2(2), the focus should be "on the *nature of the basic obligation* sued upon, not the *scope of activities* related to

---

[13] Another case with a similar procedural posture to *SummitBridge* was *In re Holden*, 491 B.R. 728 (Bankr. E.D.N.C. 2013). In *Holden*, the bankruptcy court allowed the creditor's contractual attorneys' fees under § 502 as an unsecured claim, which did not require the court to take the next step of conducting a § 506(b) analysis. Moreover, the *Holden* court was not compelled to determine the amount of the attorneys' fee under N.C. Gen. Stat. § 6–21.2. After the Debtor filed an objection to the creditor's initial claim, which listed attorneys' fees in the amount of 15% of the outstanding balance, the creditor amended the claim to reflect the lesser, actual attorneys' fees expended. At that point, the debtor withdrew its objection as to the reasonableness of the attorneys' fees under N.C. Gen. Stat. § 6–21.2. *Id.* at 730–31.

that obligation." *Coastal Production Credit Ass'n v. Goodson Farms, Inc.*, 319 S.E.2d 650, 655 (N.C. Ct. App. 1984) (emphases original). Actions taken by CFC's attorneys "reasonably related to the collection of the underlying note sued upon" may be included in the permissible attorneys' fees awarded under N.C. Gen. Stat. § 6–21.2(2). *Id.* The burden is on CFC to present evidence of its actions taken to collect on the underlying note. *Id.* at 656.

In addition to the primary requirement of documentation demonstrating a creditor's attorneys' actions are related to collecting on the underlying note, the Court may also consider those factors traditionally analyzed by North Carolina courts in assessing the scope of reasonable attorneys' fees. These factors include the time and labor expended by the attorney, the skill required, the customary fee for like work, and the experience and ability of the attorney. *WFC Lynnwood I LLC v. Lee of Raleigh, Inc.*, 817 S.E.2d 437, 444 (N.C. Ct. App. 2017); *see also Owensby v. Owensby*, 322 S.E.2d 772, 774 (N.C. 1984). Courts may also consider the difficulty of the legal questions at issue, *Owensby*, 322 S.E. 2d at 775, as well as the "importance of the litigation and the amount involved." *Hood ex. rel N.C. Bank & Trust Co. v. Cheshire*, 189 S.E. 189, 190 (N.C. 1937). As a final factor, and of particular relevance to this case, is a court's ability to consider "the procedural posture of the case in the context of the scope of statutory preconditions for award of fees." *Coastal*, 319 S.E.2d at 655. The Court will consider the documentation provided by CFC within the context of these factors and the procedural posture of the case to determine the proper scope of its attorneys' fees under N.C. Gen. Stat. § 6–21.2(2).

In the Fee Application, CFC provided timesheets of fees and costs totaling $103,627.50 and expenses of $9,812.62, which were incurred through June 19, 2019 (Docket No. 193). The itemized fees are reasonably related to the collection of the underlying notes. The hourly fees

charged by CFC's attorneys further reflect a reasonable fee considering the experience and ability of those attorneys.[14]

The Bankruptcy Administrator objects to CFC's inclusion of fees related to the interlocutory appeal, arguing that fees for unsuccessful pursuit of interlocutory appeals may be denied, but the case upon which he relies, *Price v. City of Fayetteville, N.C.*, No. 5:13-CV-150-FL, 2015 WL 1222168 (E.D.N.C. 2015), is distinguishable. Unlike *Price*, the issues raised by CFC in the interlocutory appeal were not "separate from the question of the ultimate merits" of this matter. *Id.* at *9. While flawed jurisdictionally, the interlocutory appeal brought by CFC, along with the intervening decision in *SummitBridge*, raised issues this Court has ultimately addressed within this Order. More importantly, unlike the plaintiff in *Price*, CFC did not bring the rest of the case to a halt during the pendency of the interlocutory appeal. Instead, CFC continued to cooperate with the Debtors and the Bankruptcy Administrator in moving this bankruptcy case forward, particularly through pursuing orders approving sales of the Debtors' real property. Accordingly, the Court will not disallow those fees connected to the interlocutory appeal.

The Court finds the documentation of the fees and costs of CFC, totaling $113,440.12, to be reasonable, based on their relation to the collection of the notes, as well as the balancing of the factors cited by North Carolina courts. Importantly, those fees only encompass charges through June 19, 2019 (Docket No. 193). The Court may also consider the procedural posture of the case in assessing the reasonableness of attorneys' fees under N.C. Gen. Stat. § 6–21.2(2).

---

[14] The Fee Application indicates the hourly rate for CFC's primary counsel, Daniel Bruton, is $295 (Docket No. 193). The Court finds this to be a reasonable rate given Attorney Bruton's qualifications and experience, as well as the scope of the work he performed on CFC's behalf. The reasonableness of Attorney Bruton's rate is further supported when compared to the hourly rates charged by the Debtors' primary attorneys in this case, which are $550 per hour for Thomas Waldrep and $340 per hour for Jennifer Lyday (Docket No. 130).

*Coastal Production Credit Assoc. v. Goodson Farms, Inc.*, 319 S.E.2d 650, 655 (N.C. Ct. App. 1984). The case docket in this bankruptcy case reflects the activity undertaken by counsel for CFC since June 2019, including participation in obtaining orders regarding property sales (Docket No. 203, 210), ongoing negotiations with the Debtors regarding this fee dispute as well as an attempted global settlement (Docket No. 198, ¶ 6, Docket No. 212, ¶ 6), attendance at hearings on October 16, 2019[15] and March 18, 2020, and the numerous filings, including responses and replies, relating to the Motion and Fee Application (Docket No. 193, 225, 237, 238, 245, 246). The Court takes judicial notice of this case docket, pursuant to Federal Rule of Evidence 201(b). *See Brandon v. Sherwood (In re Sann)*, 555 B.R 721, 725 n. 2 (Bankr. D. Mont. Aug. 15, 2016) (taking judicial notice of case docket); *In re Citadel Broad. Corp.*, No. 09-17442, 2010 WL 2010808, at *2 (Bankr. S.D.N.Y. May 19, 2010) (taking judicial notice of the main case docket, "including, without limitation, all pleadings and other documents filed and orders entered thereon"). CFC's actions in this bankruptcy case in the period between June 2019 and the entry of this Order reflect that counsel for CFC has expended time well beyond the hours cited in the Fee Application.

Moreover, there is legal work left to be completed in this bankruptcy case before CFC's secured claim will be satisfied, for which CFC will continue to accrue legal fees. The Debtors obtained this Court's approval for two sales of real property during this bankruptcy case (Docket No. 203, 210), but there is no indication from the docket that the Debtors closed on both approved sales and have obtained sufficient proceeds to satisfy the requirements of the

---

[15] At the continued hearing on the Fee Application on October 16, 2019, CFC's counsel described an extensive renegotiation of the terms of payment of the CFC indebtedness, which was later set forth in the Motion to Modify Plan filed by the Debtors on November 26, 2019 (Docket No. 219, ¶ 14) (modifying Article II, Section B(5)(b) of the plan to add subsection viii. Alternative Consensual Resolution of All Claims). This motion was later withdrawn on January 7, 2020 (Docket No. 222).

confirmed chapter 12 plan. Pursuant to the confirmed plan, if Debtors do not deliver $450,000 to Farm Credit on or before October 31, 2020, some portion of the remaining real property will be auctioned to obtain that sum (Docket No. 108, ¶ 8(B)(ii)). Crucially, that $450,000 amount required by October 31, 2020 will not satisfy the full amount of CFC's secured debt, thus likely requiring additional real property sales, auctions, refinancing, structured payments, or some alternative means of repayment. After entry of this Order, CFC will continue to incur additional attorneys' fees relating to the collection of its secured claim, or to enforcing or protecting its rights under the deeds of trust.

Recognizing the extensive activity conducted by CFC's attorneys in the months after the period covered by its Fee Application, as well as the additional activity that will likely occur following entry of this Order in accordance with the Court's ability to consider the procedural posture of the case, the Court finds the $181,682.51 in fees sought by CFC, representing the statutory cap of 15% of the outstanding balance due at the time of the petition, to be reasonable for purposes of N.C. Gen. Stat. § 6–21.2(2). CFC is therefore allowed $181,682.51 in attorneys' fees as part of its allowed claims pursuant to § 502(b). Because the $181,682.51 represents the statutory cap under that provision, CFC may not pursue further fees or expenses as part of its allowed claims, regardless of any additional activity, pleadings, or appearances that occur during the remainder of this bankruptcy case.

### 3. Secured Status under 11 U.S.C. § 506(b)

Having determined the amount of CFC's attorneys' fees as part of its allowed claims under § 502(b), the Court must assess the secured status of those fees under § 506(b). *See In re Nixon*, No. 09-417, 2009 WL 1845229 (E.D. Pa. June 25, 2009). Under § 506(b), attorneys' fees, such as those asserted by CFC, may be included as part of the creditor's secured claim, provided

(1) the value of the property securing the claim exceeds the combined amount of the underlying claim and the asserted fees and (2) those fees are "reasonable." *See* § 506(b); *see also* 4 COLLIER ON BANKRUPTCY ¶ 506.04(3)(a) (16th ed. 2020). The reasonableness test of § 506(b) applies to both prepetition and postpetition attorneys' fees, to the extent any creditor seeks to include those fees as part of its secured claim. *SummitBridge National Investments III, LLC v. Faison*, 915 F.3d 288, 294 n. 3 (4th Cir. 2019). If asserted attorneys' fees fail to satisfy the reasonableness test of § 506(b), those fees remain as part of the creditor's allowed claim under § 502 but are deemed unsecured rather than secured. Prior to entry of the Claim Objection Order, the Debtors and CFC stipulated that the value of the real property encumbered by CFC's liens is greater than the amount of the liens.[16] CFC is thus an oversecured creditor and the remaining task for this Court is to determine the reasonableness of CFC's attorneys' fees under § 506(b).

While federal law, rather than state law, applies in a determination of reasonableness under § 506(b), *see Bank v. Brown (In re Brown)*, No. 1:99CV01077, 2000 U.S. Dist. LEXIS 23902, at *9 (M.D.N.C. Aug. 15, 2000), many of the factors used by courts in the Fourth Circuit to assess reasonableness under § 506(b)[17] overlap with those factors considered by North Carolina state courts in determining reasonable attorneys' fees. As part of its analysis of CFC's

---

[16] Paragraph 3 of the Response by CFC to Objection by Debtors to Claim Nos. 6 and 7 filed on October 31, 2017 states: "In conjunction with the confirmation of the Debtor[s'] Chapter 12 plan, the value of CFC's collateral was stipulated to be $1.7 million" (Docket No. 101).

[17] In the Fourth Circuit, in making a determination regarding an award of attorneys' fees, a court's analysis should consider the following factors: (1) the time and labor required; (2) the novelty and difficulty of the questions; (3) the skill requisite to properly perform the legal services; (4) the preclusion of other employment by the attorney due to acceptance of the case; (5) the customary fee; (6) whether the fee is fixed or contingent; (7) time limitations imposed by the client or the circumstances of the engagement; (8) the amount involved and the results obtained; (9) the experience, reputation, and ability of the attorneys; (10) the "undesirability" of the case; (11) the nature and length of the professional relationship with the client; and (12) awards in similar cases. *In re EBW Laser, Inc.*, No. 05-10220C, 2012 WL 3490417, at *9 (Bankr. M.D.N.C. Aug. 14, 2012) (citing *Harman v. Levin*, 772 F.2d 1150, 1152 (4th Cir. 1985)); *see also In re Etheridge*, No. 18-11303, 2019 WL 6735753, at *5 (Bankr. M.D.N.C. Dec. 10, 2019).

attorneys' fees under N.C. Gen. Stat. § 6–21.2(2), the Court has already considered, inter alia, the time and labor involved, the difficulty of the legal questions raised, the skill required to perform the legal services, the customary fee for similar work, the amount in controversy and results obtained, and the experience, reputation, and ability of the attorneys. Importantly, the Court's finding that CFC's attorneys' fees are reasonable under state law further bolsters a finding of reasonableness under § 506(b). *See, e.g.*, *In re Pak-a-Sak Food Stores, Inc.*, No. 06-04078-8-JRL, 2008 Bankr. LEXIS 4390, at *15 (Bankr. E.D.N.C. Jan. 9, 2008) (finding its holding that attorneys' fees are reasonable under § 506(b) "is further buttressed by the court's conclusion that the fees are deemed reasonable under North Carolina law."). For these reasons, the Court finds the $181,682.51 in attorneys' fees within CFC's allowed claims may be treated as secured pursuant to § 506(b).

## CONCLUSION

Based on the foregoing, IT IS HEREBY ORDERED that Carolina Farm Credit's motion to reconsider is GRANTED.

IT IS FURTHER ORDERED that the objections by the Debtors and the Bankruptcy Administrator are overruled, and Carolina Farm Credit's Fee Application is APPROVED.

IT IS FURTHER ORDERED that Carolina Farm Credit's claim for attorneys' fees, to be included as part of Claim # 6, is allowed in the total amount of $164,116.51, and is to be treated as secured. Claim # 6 of Carolina Farm Credit is thus an allowed secured claim in the total amount of $1,257,726.58.

IT IS FURTHER ORDERED that Carolina Farm Credit's claim for attorneys' fees, to be included as part of Claim # 7, is allowed in the total amount of $17,566.00, and is to be treated as secured. Claim # 7 of Carolina Farm Credit is thus an allowed secured claim in the total amount of $134,850.39.

Because Carolina Farm Credit's attorneys' fees represent 15% of the outstanding balance owed on the notes at the time of the Debtors' petition, which is the cap under North Carolina law, IT IS FURTHER ORDERED that Carolina Farm Credit shall not assess, nor include in its proofs of claim, any further attorneys' fees or expenses.

**END OF DOCUMENT**

PARTIES TO BE SERVED

Wiley Walter Shore and Shelby Jean Matthews Shore
17-50459 C-12


Wiley and Shelby Jean Shore
2324 Shore Rd.
Yadkinville, NC 27055

Jennifer Lyday
Waldrep LLP
101 S. Stratford Rd. Ste 210
Winston-Salem, NC 27104

Daniel Bruton
Bell Davis & Pitt
P.O. Box 21029
Winston-Salem, NC 27102-1029

Kathryn L. Bringle
P.O. Box 2115
Winston-Salem, NC 27102-2115

William P. Miller
Bankruptcy Administrator
101 South Edgeworth St.
Greensboro, NC 27401